# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**WARREN E. ROBINSON,**
      **Plaintiff,**


      **v.**                        **Civil Action No. 02-1694 (JMF)**


**GORDON R. ENGLAND,**
**Secretary of the Navy,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Currently ripe and ready for resolution is <u>Defendant's Motion to Dismiss or for Summary Judgment</u> ("Defs. Mot."). For the reasons stated herein, I recommend that defendant's motion be denied in part and denied without prejudice in part.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

**Discrimination**

1.      Plaintiff is Warren E. Robinson, an African-American male. <u>Complaint and Demand for Jury Trial</u> ("Compl.") ¶ 3. Defendant is Gordon R. England, Secretary of the Department of the Navy ("the Navy"). Compl. at 1.[1]

2.      Plaintiff, a civilian employee, currently works as an Insulator (WG-3610-10) for the Navy Public Works Center ("NPWC") at the Washington Navy Yard. <u>Plaintiff's Opposition to Defendant's Motion to Dismiss or for Summary Judgment</u> ("Plains.

---

[1] For ease of reference, page designations within this Report and Recommendation refer to those page numbers assigned to a document by virtue of its having been filed electronically on the Court's Electronic Case Filing system ("ECF"). If a document was filed before the ECF system was in place (e.g. the <u>Complaint and Demand for jury</u>

Opp."), Exhibit 1 at 1.  He started working for the NPWC in 1995. Id.  He previously

worked for the Philadelphia Naval Shipyard. Id.

3.      The NPWC is made up of various departments, each identified by a code number.

Defs. Mot., Attachment 1, Part 1 at 46.  The Maintenance Department is designated

as "Code 500." Id. at 17.  The Maintenance Department included a Lead and

Asbestos Abatement team, designated as "Code 590". Defs. Mot., Attachment 11 at

9.  Code 590 was comprised of one plumber, one welder, three carpenters, and nine

insulators (Defs. Mot., Attachment 1, Part 1 at 46) and handled insulation and lead

and asbestos abatement projects, primarily those involving demolition work. Defs.

Mot., Attachment 3 at 4 (Tippett deposition).  Plaintiff was one of Code 590's nine

insulators. Defs. Mot., Attachment 1, Part 1 at 46.

4.      The Navy has a Merit Promotion Program ("MPP"). Defs. Mot., Attachment 1a.  The

purpose of this program, detailed in an instruction designated as

"HROWASHDCINST 12335.1F," was "[t]o set forth policies and procedures for

staffing civilian positions at grades GS-15 and below and all wage grade positions in

accordance with the merit promotion provision of references (a) through (g)." Id. at 1.

 Under the MPP, the Navy's Human Resources Office determines if the applicants

meet the basic eligibility requirements. Defs. Mot., Attachment 1, Part 2 at 40.  The

Human Resources Office also determines each applicant's creditable experience.

See, e.g., Plains. Opp., Exhibit 16.

5.      Pursuant to the MPP directives, candidates must be rated using a job element rating

_____

Trial), then the number referenced is the page number given by the author of the document.

guide or "crediting plan." Defs. Mot., Attachment 1a at 19.  A crediting plan involves

the assignment of points to each candidate based on his possession of the knowledge,

skills, and ability ("KSA") to perform the job. Id. at 8.  If a position is designated as a

Federal Wage Schedule ("FWS") position, the crediting plan must also contain a

"screen-out factor." Id. at 9.

6.      "A screen-out factor is identified as factor number one on the job element rating

guide and includes all of the essential requirements of a position combined . . .

Promotional candidates must rate a score of 2 or more points on this factor to be

considered further in any evaluation process." Id.

7.      The MPP requires that the Human Resources Office issue a vacancy announcement

that identifies the geographic or organizational area of consideration as well as the

application period. Defs. Mot., Attachment 1, Part 2 at 5; Attachment 1a at 7.

Applicants must submit a current Personal Qualification Statement. Defs. Mot.,

Attachment 1a at 22.  Applicants are given the option of providing supplemental

statements. Id.

8.      The selecting official may act as the evaluating official or he may designate an

evaluation specialist or a panel to evaluate the applications. Id. at 27.  The evaluating

official or panel may only evaluate the candidates based on the documents supplied

by the candidate. Id. at 26.

9.      Evaluating each candidate's possession of the position's KSA is based on the

candidate's experience, annual performance appraisals, awards, education, training,

self-development, and outside activities which would increase the candidate's ability

to do the job. Id. at 26-27.  If the evaluations are conducted by a panel, after they have applied the crediting plan to each application and assigned scores, the members of the panel are required to meet and reconcile the scores. Defs. Mot., Attachment 6 at 20 (Hubbard deposition).  Panelists may not differ in their assignment of scores by more than one point. Id.

10.     If a screen-out factor is being used, the evaluating official or panel is not permitted to interview any of the applicants unless and until those applicants have met the screen-out factor.  Once the evaluating official or panel determines which of the applicants are qualified for the vacancy, a list is sent to the selecting official. Defs. Mot., Attachment 1a at 28.  The list separates applicants into "best qualified" and "qualified." Id.  In addition to the list of qualified applicants, the selecting official also receives the names of noncompetitive eligible applicants. Id. at 29.

11.     Noncompetitive eligible applicants are exempt from the requirements of the MPP. Id. at 12.  Applicants may be deemed noncompetitive eligible for numerous reasons but, if "repromoted" pursuant to Section III of the MPP procedures, that individual must be "otherwise qualified" for the position he seeks. Id. at 13.

12.     The selecting official is then tasked with choosing that "person[] who will best fulfill management's needs in terms of productivity and the total objectives of the organization …." Id. at 30.  At any time during the selection process, the selecting official is not precluded from selecting an individual who did not qualify under the MPP, id., but at no time may the selecting official interview an applicant who did not meet the screen-out factor. Defs. Mot., Attachment 7 at 9 (Weimann deposition).

4

13.     At the time of the alleged discriminatory and retaliatory action, James Webster
        (Caucasian) was the Maintenance Superintendent, Head of the Maintenance
        Department, and plaintiff's third line supervisor. Plains. Opp., Exhibit 4.  Gary
        Griffies (Caucasian) was the Insulator Supervisor for Code 590 and plaintiff's first
        line supervisor. Plains. Opp., Exhibit 5.  Harry Lehman (Caucasian) was a
        Maintenance Supervisor for Code 590 and also plaintiff's first line supervisor. Plains.
        Opp., Exhibit 4; Defs. Mot., Attachment 5a at 2 (Lehman declaration).  John Tippett
        (Caucasian) was a Supervisory Environmental Protection Specialist, Head of Code
        590 in NPWC, and plaintiff's second line supervisor. Plains. Opp., Exhibit 4.  Lindl
        Clark Hubbard (Caucasian), was a Management Analyst for the NPWC's Human
        Resources Office. Defs. Mot., Attachment 6 at 3 (Hubbard deposition).

14.     Due to an increasing demand for lead and asbestos abatement work, Tippett decided
        to increase the number of supervisors within Code 590. Defs. Mot., Attachment 6 at
        5-6 (Hubbard deposition).  Tippett asked Hubbard to establish a Work Leader
        position, and draft both the position description and crediting plan. Plains. Opp.,
        Exhibit 8 at 13.

15.     As an FWS position, the crediting plan had to include a screen-out factor. Defs. Mot.,
        Attachment 6 at 4 (Hubbard deposition).

16.     The Crediting Plan was prepared by Tippett and Hubbard. Plains. Opp., Exhibit 9 at
        54 (Tippett affidavit).

17.     Evaluators were to assign between one and four points to each applicant based on the
        "[a]bility to do the work of an Insulator Leader without more than normal

supervision." Plains. Opp., Exhibit 10 at 1.  Four points were awarded if the

candidate's application indicated the following:

> Applicant has been officially assigned to act as a Leader or
> Supervisor in short absences of same.  Knows PWC supply system
> and can order/obtain necessary supplies quickly.  Is familiar with
> overhead/direct hour and the concept of charging all employees to
> direct hour work tickets.  Has used a personal computer to order
> materials/keep record of materials used in job.  Is an expert on the
> laws and regulations pertaining to asbestos/lead abatement and can
> inspect the work of others for compliance to these laws and
> regulations."

> Id.

18.     Three points were awarded if the candidate's application indicated the following:

> Applicant has been unofficially assigned to lead others on small
> jobs, but never had paperwork submitted to document assignment.
> Knows how to order supplies at PWC and has used personal
> computer at work.  No indication of knowing direct/overhead
> difference.  Knows the laws and regulations pertaining to
> lead/asbestos abatement and has instructed lower graded
> employees in abatement techniques.

> Id.

19.     Two points were awarded if the candidate's application indicated the following:

> Applicant has worked on a variety of lead/asbestos abatement
> projects and has instructed lower graded employees in
> asbestos/lead abatement techniques.  Knows the laws and
> regulations that apply to lead/asbestos abatement in the DC
> metropolitan area.  Has ordered materials for projects, but no
> indication that applicant has used a personal computer to order
> supplies or maintain material records.  No adverse information in
> application on applicant's ability to learn how to use a personal
> computer and use PWC software applications.

> Id.

20.     One point was awarded if the candidate's application indicated the following:

"Applicant has not worked on the wide variety of projects listed above.  No previous leading/supervision experience or any indication of instructing lower graded employees." Id.  If one point was awarded, the candidate was not deemed qualified for the position. Id.

21.  Tippett approved the position description, the qualification requirements, and the KSA's to be used in rating and ranking the applicants, and established two Insulator Leader positions in Code 590.  See Plains. Mot., Attachment 3 at 8-11 (Tippett deposition).  The vacancy announcement for the two positions, VA 590-0-011, was open from May 1, 2000 to May 8, 2000. Plains. Opp., Exhibit 11 at 1.  The area of consideration for the announcement was then-current NPWC permanent civilian employees. Id.

22.  The announcement listed the position's duties as follows:

> Installs materials to regular shaped surfaces to prevent burns, fires, heat loss or heat absorption, condensation, and at times, to sound proof.  Cuts and installs insulation on vents, bulkheads and overheads.  Responsible for installing insulating materials on pipes, tanks, boilers and ducts.  Installs a variety of insulating materials such as fiberglass, calcium, silicate and unicellular foam plastic.  Uses such trade tools and equipment as tape rule, knives, pliers, scissors and saws to measure, cut, trim form and install the materials.  Fills in all joints, cracks or indentations insulation surface and completely covers surface with proper cement.  Takes measurements for regular shaped portable covers.  Cuts, assembles, installs and tests various types of pressure hoses.  Routinely inspects all areas for any possible asbestos hazards.  Measures, cuts, trims, fits and installs insulating materials.  Responds to hazardous waste/chemical and oil spills.  As leader, the incumbent is responsible for directing other workers at the job site, setting the pace of the work and training new employees.

Id.

7

23.     The qualifications required were listed as follows:

> Applicants must have the sufficient knowledge, skills and abilities in the evaluating factors listed below to perform the duties of the position.  Applicants who do not show the abilities required in evaluation #1 (SCREEN OUT FACTOR) will be rated ineligible and will not receive further consideration.  * Must be certified/trained in Lead and Asbestos Abatement or be able to be certified.  * Incumbent is exposed to Hazardous Materials from HW/Chemical and spill spill [sic] clean-ups.  * Must be comfortable with wearing respirators and working in confined spaces."

> Id.

24.     The evaluation factors were listed as follows:

> 1. Ability to do the work of an Insulator Leader without more than normal supervision (Screen Out)  2. Knowledge of technical practices.  3. Knowledge of measurement and layout.  4. Ability to interpret instructions, specifications, etc. (includes blueprint reading).  5. Ability to use and maintain tools and equipment.  6. Knowledge of materials.  7. Knowledge of safety practices and procedures.

> Id. at 1-2.

25.     Tippett appointed Griffies to be the recommending official. Defs. Mot., Attachment 1, Part 1 at 15 (Griffies Affidavit).  Griffies handed out copies of the vacancy announcement to his workers. Defs. Mot., Attachment 4 at 15 (Griffies deposition).  Timely applications for the positions were submitted by plaintiff, Charles Thacker, John Anderson, and four others. Plains. Mot., Attachment 1, Part 2 at 40.  All applicants who applied were deemed eligible. Id.

26.     The rating panel for VA 590-0-011 was comprised of Hubbard, Al Sullivan, and Harry Mattingly. Id. at 41.  Sullivan (African-American) was an Occupational Safety and Health Specialist with the Navy. Defs. Mot., Attachment 1, Part 1 at 38.

Mattingly (Caucasian) was an Activity Liaison Officer with the Navy. Id. at 33.

27. Prior to the completion of the selection process, Gabriela Weimann (Caucasian), replaced Hubbard as a Management Analyst at the Human Resources Office, Code 130. Defs. Mot., Attachment 7 at 3-4. Weimann appointed Webster the selecting official. Defs. Mot., Attachment 1, Part 1 at 18.

28. The rating sheet included the applicant's name and current position, his creditable experience, and eligibility for consideration. See, e.g., Plains. Opp., Exhibit 16. Robinson was credited with having 16 years and 10 months of experience as an insulator. Plains. Opp., Exhibit 16. Thacker was credited with having 5 years and 3 months of experience as an insulator. Plains. Opp., Exhibit 17. Anderson was credited with having 4 years and 8 months of experience as a welder. Plains. Opp., Exhibit 18.

29. After the close of the application period for VA 590-0-011, Weimann prepared the list of applicants, and consolidated the rankings sheet, the rating sheets, and the selection list. See Defs. Mot., Attachment 7 at 3-11. (Weimann deposition). Weimann provided the panelists with these documents as well as an instruction sheet relating to the evaluation process. Id.; Defs. Mot., Attachment 1, Part 2 at 40, 42-44.

30. Anderson's application indicated that the highest grade he had ever held as a federal employee was a supervisor position, WS-3703-10. Defs. Mot., Attachment 1, Part 2 at 13. The panelists deemed Anderson to be non-competitive eligible. See, e.g., Defs. Mot., Attachment 1, Part 2 at 45; Defs. Mot., Attachment 6 at 7-8 (Hubbard deposition).

31.     Thacker's application indicated that he had 24 years of experience as a journeyman insulator and that he currently held supervisor certificates for asbestos and lead. Defs. Mot., Attachment 1, Part 2 at 27. The application also referenced his experience as the individual responsible for compliance with state, federal and environmental regulations. Id. The application further detailed his supervisory experience, including references to both technical and administrative functions. Id.

32.     Plaintiff's application stated the following:

> My duties include the insulation and fabrication of thermal surfacing material. I install fiberglass, calcium silicate and other insulation and with the use of a variety of tools to accomplish the job. I am also trained and certified in the removal of asbestos, lead abatement, hazardous waste, clean up and removal. As a WG-10 mechanic and certified supervisor in lead and asbestos abatement, I have been responsible to lead [sic] many major projects. I have coordinated various personel [sic] in different trades to accomplish projects.

> Id. at 7.

33.     Each panelist reviewed the applications and scored them against the crediting plan. See, e.g., Defs. Mot., Attachment 6 at 16, 20-21 (Hubbard deposition). The panelists then met to review their scores collectively. Defs. Mot., Attachment 6 at 21 (Hubbard deposition). The panel members unanimously agreed on the scoring. Id. Each panelist then completed an individual rating sheet for each candidate. See, e.g., Defs. Mot., Attachment 1, Part 2 at 51. The scores for each candidate were then placed on a consolidated rating sheet. Defs. Mot., Attachment 1, Part 2 at 53.

34.     According to the consolidated rating sheet, five of the seven applicants failed to meet the screen-out factor and were therefore not deemed qualified for the position. Id.

Plaintiff was one of those five. <u>Id.</u>

35.    The panelists determined that only Thacker met the screen-out factor. <u>Id.</u>  Anderson

and Thacker were referred to Griffies for selection. <u>Id.</u> at 54.

36.    On June 15, 2000, Griffies recommended both candidates for the Insulator Leader

positions. Defs. Mot., Attachment 1, part 1 at 11 (Griffies Affidavit).

37.    The effective hiring dates were July 2, 2000 for Thacker and July 16, 2000 for

Anderson. Defs. Mot., Attachment 1, Part 2 at 32-33.

**Retaliation**

38.    On June 28, 2000, plaintiff filed an EEO complaint. Defs. Mot., Attachment 10 at 3

(Robinson affidavit).

39.    In a separate EEO complaint filed in 2001, plaintiff claimed that he was denied

overtime between November 20, 2000 and December 12, 2000. Defs. Mot.,

Attachment 2 at 4-5 (Robinson deposition).

40.    In November of 2000, plaintiff was working at the Navy Museum, Building 76, under

Griffies' supervision. Defs. Mot., Attachment 4 at 6 (Griffies deposition).  Leslie

Clark was also working at the Museum under Griffies' supervision. Defs. Mot.,

Attachment 1, Part 1 at 13.  On November 3, 2000, plaintiff and Griffies got into an

argument about Griffies' supervision of Clark. <u>Id.</u>  Griffies reassigned plaintiff to

another project, Building 22, at the Washington Navy Yard, under Lehman's

supervision. <u>Id.</u>

41.    Lehman assigned plaintiff to paint pipes on Building 22. Defs. Mot., Attachment 5a at

5 (Lehman affidavit).  Lehman also painted pipes on Building 22. <u>Id.</u>

42.     On December 13, 2000, plaintiff went to see an EEO counselor about not being given

overtime. Plains. Opp., Exhibit 1 at 8 (Robinson affidavit).

43.     All employees, including plaintiff, were required to be fitted with respirators. Defs.

Mot., Attachment 5a at 13 (Lehman affidavit).  The respirators were fit tested on a

yearly basis. Id.  For materials other than lead and asbestos, specific cartridges were

provided for use in conjunction with the respirators. Id.  The cartridges were

maintained either on the trucks located at the job site or at the office. Defs. Mot.,

Attachment 4 at 11 (Griffies deposition).  Generally, if supplies were unavailable,

employees were to request them from their supervisors. Id.

44.     Plaintiff did some painting with Rust-Oleum, which has harmful vapors.  See Plains.

Opp., Exhibits 33-34.

45.     On July 18, 2001, Lehman gave a statement to the EEO investigator. Plains. Opp.,

Exhibit 36 (Lehman affidavit).

46.     If a project required overtime work, that work was offered to those employees who

were already working on the project or to those employees who possessed the

necessary skills. Defs. Mot., Attachment 5 at 23 (Lehman deposition).  If an

employee declined the offer of overtime, the overtime was offered to an employee

listed on the weekly overtime availability list, which was prepared at the beginning of

each week. Id. at 9-10.  The list was organized by seniority. Id. at 9; Attachment 2 at

3 (Anderson deposition).  A record of the monthly overtime offered and accepted by

each employee was also kept.  See, e.g., Defs. Mot., Attachment 11 at 11.

47.     Griffies assigned plaintiff to clean up bird droppings. Defs. Mot., Attachment 1, Part

1 at 15; Plains. Opp., Exhibit 1 at 7 (Robinson deposition).

48.     On October 1, 2001, Lehman assigned Anderson, Dewayne Eady, and Charles Gipe

        overtime work on a floor cutting project in Building 22. Defs. Mot., Attachment 11 at

        4 (Lehman affidavit).

49.     In May 2002, Dwayne Eady found Charles Thacker's notebook in an NPWC vehicle.

        Plains. Opp., Exhibit 2 at 11-12 (Eady affidavit).  Eady looked at the notebook and

        saw that it contained notes about plaintiff's interactions with Thacker. Id.

50.     Employees in Code 590 are required to have regular physical examinations because

        of their work with hazardous materials.  See Defs. Mot., Attachment 5a at 3 (Lehman

        declaration).

51.     Pictures of job sites are sometimes taken in order to show the progress of the work or

        for marketing purposes. Id. at 2-3.

52.     Lehman learned of plaintiff's first EEO complaint in November of 2000. Defs. Mot.,

        Attachment 5 at 4 (Lehman affidavit).

53.     On January 9, 2003, Lehman wrote plaintiff a letter indicating that he was worried

        about plaintiff's ability to control his anger. Defs. Mot., Attachment 5a at 15.  The

        letter also stated that an appointment had been made for plaintiff with the Counseling

        and Referral Service. Id.

54.     On June 26, 2003, Lehman issued plaintiff a letter of caution for an incident that

        occurred on June 19, 2003. Id. at 9.  In the letter, Lehman claimed that plaintiff was

        disrespectful to Lehman. Id.  Plaintiff refused to acknowledge receipt of the letter. Id.

**LEGAL STANDARDS**

13

I.      Standard of Review

        Defendant moves for summary judgment pursuant to Rule 56(c) of the Federal Rules of

Civil Procedure.  To prevail on its motion, the defendant must establish, on the basis of the

"pleadings, depositions, answers to interrogatories and admissions on file, together with the

affidavits that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  See Anderson v. Liberty Lobby,

477 U.S. 242, 247 (1986).  When ruling on such a motion, the Court views the evidence in the

light most favorable to the non-moving party. Reeves v. Sanderson Plumbing, 530 U.S. 133, 150

(2000).

II.     The McDonnell Douglas Burden-Shifting Analysis

        The gravamen of plaintiff's complaint is that suffered race discrimination and retaliation,

in violation of Title VII of Civil Rights Act of 1964, as amended. 42 U.S.C. § 2000e, et seq.[2]

Thus, the familiar burden-shifting analysis first introduced in McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973) is applicable.  Under this analysis, plaintiff must first make out a

prima facie case.  In the case of a claim of disparate treatment in the context of an alleged non-

selection or non-promotion, plaintiff must show that "(1) []he is a member of a protected class;

(2) []he applied for and was qualified for an available position; (3) despite h[is] qualifications,

[]he was rejected; and (4) either someone filled the position or it remained vacant and the

employer continued to seek applicants." Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006)

(citing Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003)).

        "The burden then must shift to the employer to articulate some legitimate,

_____

[2] All references to the United States Code or the Code of Federal Regulations are to the electronic versions that

nondiscriminatory reason for the employee's rejection." McDonnell Douglas Corp. v. Green, 411

U.S. at 792.  Once defendant has done so, the burden shifts once more to plaintiff, who must

show that the reasons proffered by the employer are pretextual. Id.  At this point, the

presumption of discrimination disappears, Holcomb v. Powell, 433 F.3d at 896, and "the sole

remaining issue [i]s discrimination vel non." Reeves v. Sanderson Plumbing, 530 U.S. at 142.

"At this point, 'to survive summary judgment the plaintiff must show that a reasonable jury

could conclude from all of the evidence that the adverse employment decision was made for a

discriminatory reason.'" Holcomb v. Powell, 433 F.3d at 896 (quoting Lathram v. Snow, 336

F.3d at 1088).  "All of the evidence" includes "any combination of (1) evidence establishing the

plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered

explanation for its actions; and (3) any further evidence of discrimination that may be available

to the plaintiff such as independent evidence of discriminatory statements or attitudes on the part

of the employees." Mastro v. PEPCO, 447 F,3d 843, 855 (D.C. Cir. 2006) (citing Holcomb v.

Powell, 433 F.3d at 896; Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1292 (D.C. Cir. 1998)).  "The

plaintiff need not present evidence in each of these categories in order to avoid summary

judgment; rather, the Court must assess the plaintiff's challenge to the employer's explanation in

light of the total circumstances of the case." Davis v. Ashcroft, 355 F. Supp. 2d 330, 338-39

(D.D.C. 2005) (citing Aka v. Wash. Hosp. Ctr., 156 F.3d at 1289-91)).

The same burden-shifting analysis applies to plaintiff's claim of retaliation under Title

VII.  In the case of a claim of retaliation, however, plaintiff's prima facie case is slightly

different.  Plaintiff must show that (1) he engaged in statutorily protected activity; (2) "a

---

appear in Westlaw or Lexis.**Error! Main Document Only.**

reasonable employee would have found the challenged action materially adverse" in that it would have "'dissuaded a reasonable worker from making or supporting a charge of discrimination,'" Burlington N. & Santa Fe Ry. Co., 126 S.Ct. 2405 2415 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)); and (3) there exists a causal connection between the two.  See generally Burlington N. & Santa Fe Ry. Co., 126 S.Ct. 2405 (2006) (holding that Title VII forbids employer actions and resulting harms that would dissuade a reasonable employee from claiming that he was discriminated against and noting further that the significance of the alleged harms is judged by an objective standard and depends upon the particular circumstances).  Once plaintiff has successfully made out his *prima facie* case of retaliation, the analysis proceeds as it would if it were a claim of discrimination.  The burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the actions it took and then the burden shifts once more to the plaintiff, who must show that the proffered reason is pretextual.

## DISCUSSION

I.      Plaintiff's Claim of Discrimination

        A.      Plaintiff's *Prima Facie* Case

        There is no doubt that plaintiff is a member of a protected class (African-American), but did plaintiff apply for a position for which he was not qualified?

        The obligation that a plaintiff show that he was qualified for the position is designed to eliminate one of the most common and obvious reasons for a person not being selected for a particular position, that he did not meet the minimum qualifications for that position. Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 n.44 (1977); Holcomb v. Powell, 433 F.2d at

896.  Obviously, if the qualifications require the applicant to speak French and she speaks

Spanish but not French, she cannot complain about not being selected.  In the ordinary case,

there is a two stage inquiry.  The first stage is determining whether plaintiff has met her burden,

which is not onerous,[3] of showing that she was qualified for the position.  If she has, the case

advances to the defendant's offering its justification for selecting the person it did.  Plaintiff

would then have to show that the justification is pretextual and that the real reason was

discrimination or retaliation.

In this case, the parties dispute whether or not plaintiff was even qualified for the

position.  As explained, *infra*, the experts whom they will call differ as to whether plaintiff was

qualified.  Their disagreement creates a genuine issue of material fact on the issue of whether

plaintiff was qualified.  I must therefore now ascertain whether there is sufficient evidence to

permit a reasonable person to find that the justification for the selection made was pretextual.

B.      Plaintiff's Pretext Argument

As I noted previously this year, "[i]n a failure to promote case, the plaintiff may attack

the defendant's reasons for selecting someone else by showing either that he was significantly

more qualified for the position or that there are other reasons to disbelieve the employer's

explanation for the decision it made." Lucas v. Paige, 435 F. Supp. 2d 165, 172 (D.D.C. 2006)

(citing Aka v. Wash. Hosp. Ctr., 156 F.3d at 1295-96).  In the case at bar, although I cannot

conclude, based on the evidence before me, that plaintiff's qualifications were so superior to

those of the two individuals selected for the position of insulator leader that a jury could find

defendant's proffered explanation pretextual on that basis alone, there is sufficient other

---

[3] Texas Dept. Cmty. Affairs v. Burdine, 250 U.S. 248, 253 (1981).

evidence

showing that the selection was not the result of a fairly administered selection process. The jury

could then conclude that the asserted reasons for selecting Anderson and Thacker were

pretextual and then infer that the race was a motivating factor in plaintiff's being rejected. Aka v.

Wash. Hosp. Ctr., 156 F.3d at 1292. In Salazar v. WMATA, 401 F.3d 504 (D.C. Cir. 2005), the

court of appeals stated:

> Specifically, a jury could conclude that WMATA failed to provide
> a "fairly administered selection process" and that its claim to the
> contrary is pretextual. Cf. *Lathram v. Snow,* 336 F.3d 1085, 1093-
> 94 (D.C.Cir.2003) (holding that a jury could draw an inference of
> discrimination where an agency departed from its normal process
> without justification); *Johnson v. Lehman,* 679 F.2d 918, 922
> (D.C.Cir.1982) (noting that although "a finding of a failure on the
> part of the prospective employer to follow its own regulations and
> procedures, alone, may not be sufficient to support a finding of . . .
> discrimination," such a failure "is a factor that the trier of fact may
> deem probative . . . in determining the true motivation behind the
> hiring decision of the prospective employer").

Id. at 509. Accord Mastro v. PEPCO, 447 F.3d at 857 (jury could find pretext if it found that

employer's investigation was not reasonably objective). The evidence, if credited, that would

establish an unfairly administered selection process is as follows:

1. That, in violation of the MPP, Tippett, rather than Webster, designated the members of the rating panel and had personal or social relationships with the panel members chosen.

2. That the panelists were inconsistent in their assessment of the applicants' qualifications.

3. That there is a significant variance between the position description and the screen out element in terms of the applicant's ability to use a computer and ordering supplies.

4. That there is a dispute between expert witnesses as to the propriety of the use of the screen out factor.

5. That there is evidence that the determination that Anderson was "otherwise qualified" for the position was erroneous.

Additionally, Tippett, who played an important role in creating the entire application and evaluation process, made a racial comment to plaintiff, albeit three years after the selection was made.

1.      Tippett's Role in the Selection of the Evaluating Panelists

Pursuant to the MPP, "[t]he selecting official will designate the rating panel members in writing." Defs. Mot., Attachment 1a at 27.  In this case, it is undisputed that Webster was the selecting official.  According to Webster, however, the panelists were selected by either Griffies or Tippett. Plains. Opp., Exhibit 42 at 185 (Webster affidavit).  Griffies denied having any involvement whatsoever. Plains. Opp., Exhibit 28 at 132 (Griffies affidavit).  Tippett, in turn, indicated that not only had he discussed the issue with Webster, but that he in fact personally asked the panelists to serve:

> I discussed this with Mr. Webster, and talked about who we thought would [sic] Mattingly had quite a few years of shop experience and was a manager; Sullivan – because he had an extensive knowledge of safety issues related to asbestos; Clark – she had worked in personnel and had extensive knowledge of the rating process, panels, etc.  I asked each of them directly if they would be willing to serve on this panel, and they all responded yes.

Plains. Opp., Exhibit 9 at 53-54 (Tippett affidavit).  All three panelists agreed that Tippett had asked them to serve.  See Plains. Opp., Exhibit 8 at 45 (Hubbard deposition); Defs. Mot., Attachment 1, Part 1 at 26 (Hubbard affidavit); at 34 (Mattingly affidavit); Plains. Opp., Exhibit 21 at 101 (Sullivan deposition).

That Tippett actually selected the members of the evaluating panel is significant because Tippett already had personal or social relationships with the panelists at the time of their selection.  In addition, some of the panelists knew Anderson.

19

a.   <u>Mattingly</u>

At one point in time, Tippett supervised Mattingly. Plains. Opp., Exhibit 20 at 98

(Mattingly deposition).  In addition, Tippet had played golf with Mattingly. <u>Id.</u>

b.   <u>Sullivan</u>

Sullivan knew all the applicants. Plains. Opp., Exhibit 21 at 101.  He indicated that he

knew Anderson prior to the selection process as a result of having worked with him. <u>Id.</u>  Sullivan

also stated that he had frequent interactions with Tippett:  "There have been times when we

would see each other three, four, five, six times a week.  Then we may not see each other for a

couple of weeks, a week of so.  But I usually saw him at least, you know, once a week." <u>Id.</u> at

108.  Sullivan indicated that these interactions with Tippet were both work-related as well as

social, as were Sullivan's interactions with Anderson, Thacker, and Griffies. <u>Id.</u> at 108-10.

Finally, Sullivan indicated that he was aware that plaintiff claimed that at least one African-

American had been terminated by Tippet due to his race. <u>Id.</u> at 110.

c.   <u>Hubbard</u>

Hubbard stated that she had no knowledge of plaintiff's race or color. Defs. Mot.,

Attachment 1, Part 1 at 28 (Hubbard affidavit).  She indicated further that she had "regular

dealings with Mr. Tippett and Mr. Griffies," although with "Mr. Tippett more than Mr. Griffies."

Plains. Opp., Exhibit 8 at 49 (Hubbard deposition).

3.   <u>The Panel's Evaluation of the Applications</u>

The panelists were not consistent in their assessment of the applicant's qualifications.

Neither plaintiff's nor Thacker's applications mentioned computer use yet the panelists

unanimously recorded it in their notes about plaintiff but not in their notes about Thacker.  <u>See</u>

20

Defs. Mot., Attachment 1, Part 2 at 46-47 (Hubbard's notes); at 50 (Mattingly's notes); at 52

(Sullivan's notes).

4.      <u>The Development and Substance of the Crediting Plan</u>

Tippett, working with Hubbard and Griffies, developed the crediting plan. Plains. Opp. at

24.  There is, however, a significant variance between the position description and the screen-out

factor contained within the crediting plan.

The position description contains the following seven KSA's:

> 1.     Must be a journeyman level insulator, with experience and the ability to measure the dimensions of pipes, fittings and other objects and cut, form and install insulating materials on items with flat, square or cylindrical surfaces and regular curves.
> 2.     Must be sufficiently skilled through experience to produce a finished lagging job that is properly installed, smooth finished and free from cracks, indentations or bumps.
> 3.     Must have a knowledge of arithmetic to perform surface measurements with such devices as rulers and calipers.
> 4.     Must have the experience to be able to apply a working knowledge of the general purposes and properties of insulating plastics, fiber-glass and other materials including the related handling techniques and tools required to install them.
> 5.     Must be skilled in the use of such tools of the trade as electric cutters to prepare portable insulator covers for regular shaped valves, fittings and flanges; sewing and stapling machines for making portable bags and canvas covers for cold surfaces; and saws, shears, knives, needles and pliers.
> 6.     Must be able to apply a working knowledge of the general purposes and properties of bulkhead and vent insulation; including the related handling techniques and tools required to install same.
> 7.     Must be trained in hazardous waste/chemical and oil spill clean-up and disposal procedures.

Plains. Opp., Exhibit 12 at 66.

By comparison, the crediting plan stated the following:

> Applicant has worked on a variety of lead/asbestos abatement projects and has instructed lower graded employees in

21

> asbestos/lead abatement techniques.  Knows the laws and
> regulations that apply to lead/asbestos abatement in the DC
> metropolitan area.  Has ordered materials for projects, but no
> indication that applicant has used a personal computer to order
> supplies or maintain material records.  No adverse information in
> application on applicant's ability to learn how to use a personal
> computer and use PWC software applications.

Plains. Opp., Exhibit 10 at 1.

Significantly, the one skill that the panelists counted against plaintiff but not against

Thacker, the ability to use a personal computer, is only present in the crediting plan.  There is

simply no mention of it in the position description.

5.      The Independent Personnel Specialists Conclusions

David Knudsen, a personnel management consultant hired by plaintiff, concluded that

plaintiff should have been deemed qualified for the position. Plains. Opp., Exhibit 13 at 71.

Specifically, Knudsen found that the screen-out element used by the evaluating panel to

eliminate applicants from consideration was not consistent with the position's KSA's, as listed in

the position description. Id.  First, Knudsen contends that the position description requires only

"training in 'hazardous waste/chemical and oil spill clean-up and disposal procedures'" as

opposed to "work[] on a variety of lead/asbestos abatement projects." Id. at 72.  Second,

Knudsen contends that knowledge of "the laws and regulations that apply to lead/asbestos

abatement in the DC metropolitan area" is simply not a requirement of the position. Id.  Third,

Knudsen points to the fact that the position description makes no reference to ordering supplies

and using a personal computer whereas the screen-out factor does. Id.

In addition to finding that plaintiff should have been deemed qualified, Knudsen also

concluded that Anderson should not have been deemed "otherwise qualified" for the position. Id.

at 74.  Specifically, Knudsen found that although Anderson previously worked as a welder, and

had some insulation experience, there was insufficient documentation to show that the

experience was commensurate with that of a journeyman.  Id.

The government's personnel expert, Van K. Yee, determined that the screen-out element

was not improper, was merit based as required by the MPP, and was consistent with the

position's KSA's.  Defs. Mot., Exhibit 15 at 3.  In conclusion, Yee writes:

> The crediting plan use was job related and the evaluation process
> was proper in accordance with the merit promotion plan.  Mr.
> Thacker's application clearly supported higher qualifications and
> evaluations than that of Mr. Robinson's.  Moreover, Mr. Anderson
> was selected outside of the merit promotion process through a non-
> competitive action.  The non-competitive action is not subject to
> the merit promotion; therefore any comparison between the
> selection processes used for Mr. Anderson and Mr. Robinson is not
> meaningful."

Id. at 5-6.

Factual disputes over a position's requirements are for the jury to determine, particularly

when persons said to be experts provide diametrically opposed testimony about those

requirements.  See Davis v. Ashcroft, 355 F. Supp. 2d at 342.  Thus, whether or not the applicant

for the insulator leader position needed to be able to order supplies and use a personal computer

is a question for the jury.

### 6.        The Discriminatory Statement

Plaintiff claims that in 2003, he and Tippett had a discussion about plaintiff's concerns

over discriminatory practices in Code 590. Plains. Opp. at 23.  Plaintiff claims that during that

discussion, he told Tippett that he believed Tipppett had deliberately fired certain black

employees and that in response, Tippett said:  "I'll fire your black ass too." Id.; Plains. Opp.,

Exhibit 1 at 9-10 (Robinson affidavit).  Even though plaintiff alleged that the statement was made in 2003, clearly after plaintiff's non-selection for the position of insulator leader, it was made by Tippett, the individual responsible for selecting the evaluating panelists and developing the crediting plan.  Therefore, a reasonable jury may view it as evidence of discriminatory animus.  The statement was made by a person who played a central role in the hiring process and, while it was made after the decision was made, it was an insulting and explicit reference to the plaintiff's race.  It may therefore be highly probative of a discriminatory animus.  See Lucas v. Paige, 435 F. Supp. 2d at 171.

II.      Plaintiff's Claim of Retaliation

        The parties do not dispute the fact that when plaintiff filed an EEO complaint, he was engaging in protected activity. Plains. Opp. at 11; Defs. Mot. at 33-34 (omitting any discussion of protected activity).  The parties have not, however, addressed whether, pursuant to the standard articulated by the Supreme Court in Burlington N. & Santa Fe Ry. Co., 126 S.Ct. 2405 (2006), a reasonable employee would have found the challenged actions materially adverse in that it would have dissuaded him from making or supporting a claim of discrimination.  I therefore recommend that, as to defendant's motion for summary judgment on plaintiff's claim of retaliation, the motion be denied without prejudice pending further briefing by the parties.

## CONCLUSION

        I recommend that Defendant's Motion to Dismiss or for Summary Judgment be denied in part and denied without prejudice in part.

        **Failure to file timely objections to the findings and recommendations set forth in this report may waive your right of appeal from an order of the District of Columbia**

adopting such findings and recommendations.  **See** **Thomas v. Arn**, 474 U.S. 140 (1985).


_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

Dated: